Can you call the first case please? Case number 162166, Mrs. McConaughey filed a lawsuit for Ismie Mutual Insurance Company. We're going to argue the matter. Please support, please. Mr. Honor, Chief Justice Stamos, Mr. Klinek on behalf of the appellants. Marshal Honor, Michael Rasak on behalf of the plaintiffs' affiliates. Okay. Honor, our colleague, Justice Ratchford, won't be able to join us this morning, but she will be joining us in a decision and be listening to the tape. As I was telling my counsels, you're probably aware of this, but the microphones are amplified, but they're recorded so if you can keep your voices up, that would be appreciated. Fifteen minutes apiece. Any chance for a five-minute rebuttal in addition, Your Honor? Five-minute rebuttal. I have no objection to that. Five-minute rebuttal it is. Okay. Thank you, Your Honor. May it please the Court, James J. Stamos for the appellant. I'd like to address, we have a large number of issues we raised in our brief. I'd like to address four of them. I couldn't speak, but I had the time to do that. Obviously, any others that you wish to ask questions about, I'll address. The first is that we were required to try this case to a six-person jury when the Constitution afforded us the right to a 12-person jury. We're entitled to reversal on that basis alone. The second is that the issues in burden instructions were the old MPI instructions that did not incorporate the law announced in Haddock and in Powell. The jury is therefore not required to find that we had violated the elements or that the elements had been met that the Supreme Court set out and that this Court refined in Powell, and we're entitled to reversal on that basis as well. We've asked for a JNRV on both counts, the bad faith count as well as the punitive damage count, the willful and wanton count. I'd like to address the punitive damage count in particular without by any means suggesting that we think anything less about our count one JNRV request. And finally, if we have time, I'd like to address several other instructions and evidentiary rulings that we believe were erroneous and were grossly prejudicial to ISBI. Now, going to your jury issue, one of the arguments they raised is that we comply with Rule 19. Rule 19 was complied with. We did give a Rule 19 notice in the trial court at the time of the post-trial motion. Rule 19 had been complied with by literally hundreds of other people, including the lawyers in the Kakos case. As we put in our briefs, we have affidavits that are included within our papers that demonstrate that we inquired with the Attorney General. The Attorney General, Mr. Flavin, I think is the Associate Attorney General, advised us that they had received hundreds of requests and were not participating and did not, in fact, participate in the Kakos case. But their argument here is that it wasn't timely. The notice wasn't timely. There has been no Illinois appellate court case that has found that where a notice was given in the trial court, they would not consider the constitutionality of the statute in question. More importantly, Rule 19 itself says that the purpose of the rule is to afford the Attorney General the ability to defend the statute. In this case, the statute has already been found unconstitutional, so Rule 19 plays no part. There's nothing for the Attorney General to do or have done in this case. Now, with regard to the 12-person jury, the Kakos case found that the Illinois Constitution requires 12 jurors. And the plaintiff's response to that is that, well, we have to show prejudice in order to have redress. So there's no dispute that we had a constitutional right violated by being required to try this case in front of a six-person jury, but they say you must show prejudice. No country, no case in the country has ever required that, where fewer than the required number of jurors was given. Both in civil cases, for example, the Perkins case, and in criminal cases, for example, the U.S. versus Cabello case, the court found you cannot inquire, you cannot determine what the jury would have done. It's impossible to do. And as a consequence, reversal is the only remedy for it. There's no ability, in fact, in Illinois to try to show prejudice, because Rule 606B prevents us from inquiring of jurors what happened during deliberations. They're asking that this court be the first court ever to require a showing of prejudice. It's not possible. It's not allowed under Illinois law, and we're entitled to reversal. Our Supreme Court in the Kakos case said that the statute was void ab initio. Yes, sir. Does that mean that at the time when the trial court said we're going with six instead of 12? It was void at that time. At that time, we were entitled to 12 jurors. And, in fact, we put a jury demand in. We filed a 25-page or 30-page brief at the beginning of the case on the topic, and there was a brief argument about it, but the court said that he would allow a six-person jury. So we preserved it. It was void ab initio. We were entitled to 12 jurors. To my knowledge, our case was the only case tried in a law division to a six-person jury. I don't know if any others have looked around and haven't gotten an official word on that. We would be the only people in the state's history not to have had a 12-person jury and to have been bound by its judgment. Otherwise, we'll just pack up our bags and all go home, right? We would hope that that's the way you'd see it on the jury issue, but there are other issues that are very important that we hope the court will address. All right. Now, with regard to the second point, the court insisted on using the old IPI instructions for bad faith. There's a pair of IPI instructions for bad faith. And those that were used, the issues and verbal instructions were created, were promulgated in 1995 and have never been changed. The comments section from that entry says, as of 1995, the Supreme Court has not yet established the elements of the claim. The Supreme Court did that in the Haddock case in 2001, established the three elements for a bad faith claim. This court, in the Powell case in 2014, established the quantum of proof that's necessary. It has to be more likely. It has to be shown that this group was more likely than not to lose and should have known it was more likely than not for there to be an excess judgment. The court stated that because the IPI committee had not changed the instructions, it must be the correct law. Rule 239 provides that it's the law that governs the IPI, not the other way around. Here, what's most interesting in this case is that we moved to dismiss the plaintiffs. I believe their first amended complaint on the basis that they did not plead the Haddock and Powell elements. They conceded that motion and pled their second motion. I'm sorry, their second amended complaint. And the complaint that we tried the case on included the Haddock and Powell elements. Yet the jury instructions did not require the jury to find that the elements had been complied with. As a consequence, the jury was misinformed, was misinstructed, and we are entitled to reversal on that basis as well because the jury was not required to find what the law requires them to find and what the plaintiffs conceded they had to plead. The third element, the third issue I'd like to address. Counsel, let's talk about the JNOV. Yes, ma'am. What issues should be addressed by this court if we were to find that a new trial is warranted? Yes. Based on the sixth person, a jury being found unconstitutional by our Supreme Court. The first would be the jury instructions that I just described. I think it would be appropriate for the court to find that the instructions that we offered that did incorporate the Haddock and Powell cases are the instructions that should have been given. That would be the first thing that I would ask that you address and rule on. The second is we have requested JNOV both on count one and on count two. We believe the facts of this case simply don't warrant a judgment on either count. But I'd like to address the second count, if I may, which is the worthwhile warranted count, the entry of punitive damages. We ask you to reverse that outright. And the basis for that – Just back it up for a moment, going back to the constitutional issue. Yes, sir. Well, how can we do that if the jury that was placed into the box was in violation of the statute? So there's no trial there. So how can we end up saying that you get a verdict notwithstanding a verdict when there really shouldn't have been a verdict in the first place? Well, I think the court is empowered to do that. Because what – under the Kelsey case – under the Cato case, I understand the issue. If it wasn't a trial, how could you address any of the issues? But I believe – and I'm blanking on the rule right now, but I believe the court is instructed by the rules, the Supreme Court rules, to rule on all the outstanding issues. So if we go back down and have another trial, we don't have to try the whole thing all over again. I believe this court is empowered to make these rulings irrespective of the ruling on the six-person jury. And I would ask you to do that, because if we try it again, these issues are going to be right back. And if it goes back to the same judge, we're going to have the same instructions and it'll be a bouncing ball. But I have a 12-person jury. Well, we would hope so, but we would also hope to have these additional issues addressed. So I think – and we would ask you to do that. We think you're empowered to do that. Now, on the next issue – But if we rule in your favor on the jury issue. Yes. Aren't all other new trial issues moved? I don't believe so, because whether it was a six-person jury or a 12-person jury, we're asking you to revisit rulings the court made and will have to make again. So it's not that it was a nullity. I mean, we believe that it was a reversible error that we had a six-person jury, but I believe the law still allows you to address all of the issues in the case and to decide them. Otherwise, we go back down, for example, what's the instruction on the jury? What's the court's ruling on the jury instructions? We won't have one. Whereas, I believe you have the power to do that, Your Honor. So where do we draw – do we draw a line? And if we do, where do we draw the line? Do we draw it at the point in time when the jury wasn't paneled? Because at that point in time, it's a violation of the statute. So everything that was moved on beforehand in terms of motions eliminating, et cetera? I don't believe there's a line. There is a line? I know of no – and my opponent hasn't argued that there is, and I've seen no authority that would call for that. I believe this court is empowered to decide every issue before, and I ask you to do that. I don't think there's a line. But how can you even be entitled to a JNOB when there are still the issues of credibility and disputed issues of fact? Let me address that. I will. Yes, I will. The issue of – you say the credibility questions. Under the Kelsey case – And disputed issues of fact. Truly. But under the Kelsey case, whether the facts that were presented, taken most favorably to the plaintiff, whether those facts are sufficient to sustain, to justify punitive damages, that's a question of law, not a question of fact. And the review under the Caylor case is deniable. You look at the evidence in this case, and the court is entitled to serve the gatekeeper function of determining that these facts, the best shot the plaintiff has, look at those facts, does that justify the entry of punitive damages, which are punishment? And so you're authorized to do that based on the record. The jury instructions – I'm sorry – punitive damages are disfavored because they're punishment. And the court must use a gatekeeper function to prevent punitive damages from affecting a trial where they don't belong. And let me describe why I believe the evidence, if you look at it in this case, does not justify punitive damages. Never did, and the court should have granted my directive finding on that. In order for there to be punitive damages, the conduct must be found to have been reprehensible. That's the word that's thrown around a great deal. In the Stokervich case, this court said that – because the court said that what must be shown is, quote, no blame attached to intentional wrongdoing. In the Leitz case, which cited a restatement with approval, it said, quote, it must show, quote, some element of outrage similar to that usually found in crime. So looking at the facts of this case, you have to find that that's what you see in order to have justified punitive damages. Here in the plaintiff's brief, when they present the various arguments they make, most of them have nothing to do with the issue in the case that matters. Our duty, if it existed, was to settle the case. That's what they're saying. So the question is, was our failure to settle reprehensible? When you think of all the circumstances, when we failed to settle, was that reprehensible? And I think the way to view that, I think, is to look at a case where we know it was reprehensible, which was the O'Neill case. In the O'Neill case, on the likelihood of success in O'Neill, there was no likelihood of success. Everyone in the claim department, the outside lawyer, they all said, you aren't going to lose, you should settle the case. On the question of whether there would be an excess award in that case, it was acknowledged there would be an excess award. There was a $20,000 insurance policy, and the poor woman was totally disabled. So in that case, they had done that 45 times. So the court found that there was no explanation for not settling, other than the company didn't want to settle. That's where punitive damages were allowed. It was $2.3 million was allowed in that case. In our case, if you look at the likelihood of an excess judgment, our belief was we had $4.5 million in effective coverage, taking into account that there was a setup. We believed that was there for the poor young girl who had passed away. There was going to be no future damages. There was going to be no loss of a normal life going forward. We believed our judgment was $4.5 million was ample insurance coverage. The evidence was not disputed that the plaintiff's lawyers thought about the same thing. Mr. Dargis testified that he thought it was between $4 and $5 million on the wrongful death claim. The senior partner of the firm, Mr. Mallon, he testified that he thought the case had a verdict value of $3 to $4 million. So we believed that it wasn't an excess case. They had the same judgment. It turns out we were all wrong. But how could our judgment, which is the same as the plaintiff's lawyers, constitute no outrage? It was just we were wrong that by no means could that judgment be the basis for saying we acted almost as we were committing a crime. And as to the likelihood of winning the case, we all believed that we would win the case. Our counsel, our shoemaker, believed we would win the case until the moment the verdict came back. We had the experts in the plaintiff's case pointing fingers at each other, disagreeing about a key issue. We had empty chairs. We believed we would win the case. But we were wrong about that. But there's no basis to suggest, and no facts have been presented to you that suggest that that error in judgment amounted to punishable conduct. And finally, the plaintiffs attempted in discrepancy to generate evidence that we had done this repeatedly, that they found 25 cases that they thought they could show came up with a pattern. They weren't able to do that, and they withdrew that. Contrary to the conduct of the plaintiff's brief, the jury heard nothing about any conduct by ISME in any other case. There was one case, this case. There was no pattern here like there was in O'Neill. In fact, the only pattern there was in our case was that, and this is all of record, the insurers were the only people to whom we were on duty in this case. They have remained our customer to this day. They buy insurance from us. Mr. Schumacher is the lawyer they asked for for every case. And it's his conduct that was supposed to have been reprehensible. They asked for his case, him to represent them every time. And, in fact, as a matter of public record, he successfully defended them in a jury trial late last year. Was all of this part of the brief? It was. It was. It was. So we were in the bizarre position of having failed to be responsible to pay punishment of $13 million to the Hannas to whom we owe no duty for conduct we are alleged to have made with regard to our insurance, who continue to be our insurers and continue to work with us, apparently happy with what we do for them. We believe that the facts of this case simply did not justify an award of punitive damages, and we ask that you reverse outright on that issue. The – I would like to make one more point, if I may. This is an additional issue of what I believe to have been an erroneous ruling by the court. The court allowed the plaintiff to tell the jury that the plaintiff's lawyer had written me a letter in 2013 asking to settle this case, and the issue in response had not settled. And the trial court allowed the jury to hear about that settlement, their settlement offer, and our refusal to settle. We were far away as far as that. I've been trying cases for 38 years. I have never had a jury hear about settlement negotiations. And the court – not only did the court – Well, how does that letter in and of itself show that there is poor faith? It just said that – The court believed – the basis for the court allowing it was the court thought it was evidence of further willful and rotten conduct. And furthermore – There was just a communication about possible settlement. And the fact that we didn't settle. They were allowed to say that in response to this letter, ISTE refused to settle. And in the first minute of closing argument, the plaintiff's lawyer talked about that letter, and that was one more time that we had acted improperly. And the trial judge not only allowed the jury to hear that we had responded positively to that settlement offer, but sui sponte barred us from talking about offers we had made. How often does that happen over at the Davis Center? In my experience, never. I've never had a jury – You're talking about someone sending a letter saying, why don't we talk settlement, and then it doesn't happen. It happens all the time. Does that mean everybody deals in bad faith then? Truly. That's why the jury should never have heard about it. And that's why the court was aroused to let the jury hear it in this willful and rotten case where they were allowed to argue. And they received the letter in 2013, and they wouldn't settle it then. And the position of the court was that our not settling was evidence of willful and rotten conduct, which means our being on trial. If you don't settle your trial, our being on trial must have been willful and rotten misconduct. But Rule 408, doesn't that allow for the introduction of evidence of settlement? In bad faith. Offers and negotiations to establish bad faith. Yes, exactly. But it's evidence of failing to settle the underlying case, not the case that we're in here, because that's what the underlying case is about, failing to settle. But doesn't 408 reflect the federal Rule 408, which many of our state courts have been using for many years? Your Honor, we cite the Niagara case in our brief. The Niagara case was a federal case which holds exactly what I'm arguing here, which is that it's appropriate to tell the jury in a bad faith case about failure to settle the underlying case. It is not appropriate to tell them about failure to settle the case on trial. I think that's all of my time. I appreciate it. All right. Thank you. Morning. Morning, Your Honors. As I said, Michael Rasek here on behalf of the Blankensack Police. Obviously, the overriding issue, overarching issue, of course, is the jury question. We've briefed it. I don't know that I have much to add except to remind the Court that there isn't a case where the number of jurors in a civil case has necessarily resulted in a finding that there was no trial. The only case that this Committee has been able to cite is an unusual case where, after the trial had gotten to a certain point, the Court let some jurors go and kept only those who basically were already against one of the parties. That was not a pure number of the jurors' case. And I would suggest to the Court that there is nothing in this record that creates a hint that something about more jurors was going to change the result. And I know it's impossible, and that's what they talk about in structural error. One of the grounds for structural error is when you cannot prove that you were harmed by it, so they call it a structural error. But that's always been applied in criminal cases where the bar is so high. All right. The Supreme Court basically addressed that issue in calculus, didn't it, in saying that you have to follow what's in the Constitution, and the Constitution says that you're not supposed to change our system of jurisprudence in regards to juries. It clearly said that. You have a constitutional right to a 12-person jury in a civil case. And, of course, half of the Court is, does that necessarily require a new trial? Is that a constitutional violation that does not rise to the point without some other support that requires an automatic new trial, an automatic? But the Court also said that the amendment to the statute was void ab initio. Yes, sir. What does that tell us? That tells us that the moment that a 6-person jury was in peril and slaughter, it was a void trial, right? That's correct. And that would lead to the next question, Justice Hall's question, is what is the Court to do if it, in fact, decides that the trial is unconstitutional? One issue that I believe the Court, whether it has to or not, would help the parties, would be addressing the instruction issue. It's not going to be, if the Court determines that the trial has to be had again with 12 people in the jury box, we're going to have all kinds of new issues. There's going to be a different judge. There's going to be different arguments that could be different. But one issue is going to stay there, and that's going to be the instructional issue. In this case, the plaintiff gave the jury instructions, the forum jury instructions. And the, excuse me, the defense says those are not proper because their basic opinion, their basic position is that the Haddock case, the Illinois Supreme Court in the Haddock case, somehow changed the law. That's just not the case. The Haddock case was a 2-615 motion to dismiss. The only issue in the Haddock case was whether or not the insurance company had a duty to settle before a lawsuit was filed. That case did not involve what you needed to prove to a jury or what the instructions should hold. If Haddock thought, if the Haddock Court thought it was really changing the law and it was going to have to change all the instructions, they might have given us a hint someplace, and they did not. And since then, everybody in every one of these cases has simply used the forum instructions. And the forum instructions, we set it out in our brief. There's more than the issues and the burden of proof instruction, and that's the critical point. It starts with the definition of bad faith, which nobody quarrels with, and it sets out the factors that the jury has to consider in deciding if there's bad faith. I presume the reason they set up that odd sequence of definition of bad faith, factors to be considered, issues and burden is because it is such a complex issue. Reading the briefs and just trying to talk about it, you have to show a reasonable probability that the verdict would have been in excess of the coverage and a reasonable probability that there would be a verdict against the insured. Trying to define those further for a jury is almost impossible. So what the Courts and Jury Instructions Committee did was to set out a list of factors. But aren't you and counsel really asking us to render as an advisory opinion here? Yes. Isn't that against our... It is not. To say I respectfully disagree is always a word that shouldn't be there. I disagree. There are many cases, a sufficient number of cases, where the appeals court has said, we recognize it's going back for a new trial, but the lawyers need some guidance when it goes back. This issue is just going to come up again. And without it, this case has already been pending how many years? If it has to come back up on one further appeal, and it probably would, because there's a huge discrepancy between what the ISME thinks should go into bad faith and jury instructions and the position that the ones that are there are good. There's not going to be a way to bridge that gap in a jury instruction conference. That's my concern. The balance of the points... So then you agree that the patent jury instructions on bad faith need to be modified? No, I'm sorry. No, I do not. We believe that the bad faith jury instructions are fine. The head of court did not change the burden of proof. It did not change what you need to plead. It did not change anything at all. So you don't think they need to be modified in order to account for the Haddock and the Powell decision? No. Powell creates an issue for us. The appellate court in Powell did say that a reasonable probability means more probably true than not. I can't find any place in the country where anybody else has said a reasonable probability means more probably true than not. You can look in the IPI form instructions. There's actually a reasonable probability instruction in zoning law. They don't define it. Reasonable probability comes up, and you've seen that word in the ineffective assistance of counsel cases that both sides cited for the constitutional structural error argument. Reasonable probability is a word that stands on its own. If you try to define it further in this context to more probably true than not, that would appear to be counter to the Mid-America Bank case and to the Seventh Circuit in Twin Trails, I think it is, where you talk about comparing two factors. What are the chances that the defendant will lose the case, and what are the chances that the verdict will exceed the coverage? You can't just look at one or the other. They balance out. If there's a tiny, tiny chance that I will lose my case, but a highly 99 percent chance that I will be bankrupt when I'm done, that's a different factor than if there's a 50-50 chance, but the damages won't be so high. That's what the Seventh Circuit discussed in the Twin Trails case. It's what they discussed in Wegman. It's really what the court in Mid-America discussed, and had a case did not have any, didn't address those because that wasn't the issue there. And if they didn't address that, then there we do believe to the extent that Powell said that you need to prove both factors more probably true than not, they were wrong. What about Counsel's 408 argument? It guides to the letter. Oh, I'm sorry. The omission of the, I had to think about 408. I'm sorry. I drew a complete blank. I know the omission of the letter. For one thing, everybody knew that they hadn't paid the judgment. Because if they had paid the judgment, we wouldn't be there at that trial. It wasn't a secret that they hadn't paid it, so I suspect that the letter had zero influence on anybody. It told the jury the obvious. The trial court judge ruled that the exposure of the insureds continued despite the assignment. There's still a judgment against them, and essentially the bad faith in failing to protect the insureds extends, I guess, until the judge ended it in 2013. The trial judge cut it off. The bad faith does not go away. Bad faith has got a whole number of elements in it here. We've alleged more than one kind of bad faith. Bad faith in communicating to the insureds. Bad faith in having an internal process, which almost guarantees that the result will be skewed towards never settling because the PIC committee doesn't get the information about the value of the case. How can any evidence regarding a 2013 settlement offer possibly be relevant to establish bad faith in reference to a 2009 excess judgment? It doesn't, and I think I phrased it wrong before. What it shows, at least that's what the trial court said it shows, it's relevant to the fact that plaintiffs were seeking punitive damages, and the continued failure of the company to acknowledge its duty to its insured just shows an attitude that matches up with the other attitude. They simply are not giving the insureds credit for the insured's interest. That's how it came in. That's why the trial court judge left it in. That's why it's relevant. Unless you have further questions. Okay. Thank you very much. Thank you. Roberto? Yes, Your Honor, briefly. The fact of the matter is that in 1995 when the IPI promulgated the instructions under the 710 section, it made the observation that the Supreme Court had not yet established the elements of a bad faith claim. The Supreme Court did that in headache. It said that you can't have a recovery against an insurance company unless it has a duty to settle and fails to settle. It established three elements to that duty. One, that it's possible to settle. The plaintiff will take the settlement. Number two, reasonable probability of a plaintiff's verdict. And number three, reasonable probability that that verdict would be excess. The Powell case then adopted headache and expanded on it and said the court did not describe what reasonable probability meant, and this court said it's going to be more likely than not. It is an objective standard. It is the law of the state based upon the Powell case. There's no basis to ignore that. The second on the notion that there are factors to be considered, the old instructions talk about factors to be considered. That's true. But the headache case doesn't talk about factors to be considered. It's elements to be proved. And the plaintiffs accepted and agreed that those elements had to be pleaded and proved when they conceded a motion to dismiss and pleaded over it. And the complaint we went to trial on had the headache-slash-Powell elements pleaded in it by their agreement. I don't understand how they can now stand before you and say those elements really didn't apply. They conceded the motion at the time. With regard to the 408, the way that 408 was used, the way that letter was used was in closing argument, players' counsel within a minute of closing argument beginning pointed out that we hadn't yet settled and this was one more way that we were violating our duty to the Hannas. The entire closing argument in this case was based upon the motion, and I objected repeatedly to this, that we had harmed the Hannas, that Mrs. Hanna had come from Iraq, that she'd suffered nightly her childhood was injured. It's all true. They're not about it. But they were the plaintiffs in interest. They were the plaintiffs in name only. There's a jury instruction that says the real parties in interest are the Chamses, and the entire closing argument was intended to, and I will tell you successfully, work the jury's emotions up about the Hannas when we had no duty to the Hannas. And this was despite my repeated objections. And the only reprehensible conduct that was told to the jury in that entire trial, in that closing argument, was a letter that Mr. Schumacher wrote, not something Isme did, but a letter that Mr. Schumacher wrote to us on his judgment of what a settlement run out might be. There's no daylight between Isme and Mr. Schumacher, and Isme has absolute confidence in him. He didn't do anything wrong, but that is the only reprehensible conduct that was put to the jury. And what about Mr. Raschek's argument that the use of the letter was obvious, and all the jurors realized that that's the reason they're in the courtroom in the first place? Well, let's assume for a moment that that would excuse the letter being admitted. It would not excuse the court not being there. Then Suresh Fati ruled that I could not point out the times we did offer money. He did it on his own motion. The judge said, I'm going to let the jury hear about that because it's relevant to willful and wanton misconduct, which means I'm being willful and wanton for Isme right now by arguing this, because what's changed? We still haven't paid a settlement. How is that rational? But more importantly, it wasn't just a matter of the jury hearing about it and figuring it was okay. It was used in closing argument, the fact that we had to settle in response to that letter. It was used in closing argument to further make us look like we were acting willfully and wantonly by not settling. So we ask you to find that the facts in this case simply do not support a punitive damage award, and to reverse outline on that, because a punitive damage can be considered in this case, where we had all this insurance, and we thought the same amount that the plaintiffs did. Punitives would have to be considered in every tort case, and that's just not the law in Illinois. Thank you. Thank you. All right. I want to thank counsels for a well-briefed matter, well-argued. We will take it under advisement, and this court is adjourned. Thank you.